E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
KEVIN B. REIDY (Cal. Bar No. 320583)
KATHY YU (Cal. Bar No. 268210)
Assistant United States Attorneys
Violent and Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-8536/2431
     Facsimile: (213) 894-3713
     E-mail:    kevin.reidy@usdoj.gov
             kathy.yu@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-00351(B)-AB |
|     Plaintiff, | GOVERNMENT'S TRIAL MEMORANDUM |
|       v. | |
| JOHNNY RAY GASCA, | |
|     Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kevin B. Reidy and Kathy Yu, hereby submits its trial memorandum for the above-captioned case.

//

//

//

1    The government respectfully requests leave to file additional

2    memoranda as may become appropriate before or during the course of

3    trial.

4    Dated: November 22, 2022          Respectfully submitted,

5                                       E. MARTIN ESTRADA
                                        United States Attorney
6
                                        SCOTT M. GARRINGER
7                                       Assistant United States Attorney
                                        Chief, Criminal Division
8

9                                       _____/s/_____
                                        KEVIN B. REIDY
10                                      KATHY YU
                                        Assistant United States Attorneys
11
                                        Attorneys for Plaintiff
12                                      UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   STATUS OF THE CASE..................................................1

     A.   Indictment....................................................1

     B.   Discovery.....................................................1

     C.   Trial.........................................................1

     D.   Motions in Limine.............................................2

II.  THE CHARGED OFFENSES...............................................3

     A.   Kidnapping (Count One)........................................3

          1.   Kidnapping – Interstate Commerce........................3

          2.   Kidnapping – Special Maritime and Territorial
               Jurisdiction............................................4

     B.   Interference with Commerce by Extortion (Count Two).......6

     C.   Attempted Obstruction of Justice (Counts Three and
          Four).........................................................8

     D.   Attempted Witness Tampering (Count Five)..................9

III. STATEMENT OF FACTS................................................11

     A.   Defendant Begins Fraudulent Relationship with Victim
          E.C. to Get Her Money........................................11

     B.   May 2021 – E.C. Escapes from Defendant's Grasp..........12

     C.   Defendant Tells His Friend That He Needs E.C's Money.....12

     D.   After Kidnapping E.C., Defendant Takes Her to the Bank
          and Drains Her Account.......................................16

     E.   Defendant Tries to Cover Up His Scam....................17

     F.   Defendant Knew E.C.'s Mental Condition Was
          Deteriorating................................................19

IV.  Crime Victims' Rights Act.........................................19

V.   CONCLUSION........................................................21

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

**Table of Authorities**

**Cases**

Faretta v. California,
  422 U.S. 806, n.46 (1975) ................................... 21

Kenna v. U.S. Dist. Ct. for C.D. Cal.,
  435 F.3d 1011 (9th Cir. 2006) ............................. 20

Martinez v. Court of Appeal of California, Fourth Appellate Dist.,
  528 U.S. 152 (2000) ....................................... 21

United States v. Akiti,
  701 F.3d 883 (8th Cir. 2012) ............................... 9

United States v. Atcheson,
  94 F.3d 1237 (9th Cir. 1996) .......................... 7-8, 8

United States v. Bernhardt,
  903 F.3d 818 (8th Cir. 2018) ............................ 9, 10

United States v. Byrne,
  435 F.3d 16 (1st Cir. 2006) ............................... 11

United States v. Clayton,
  108 F.3d 1114 (9th Cir. 1997) .............................. 4

United States v. Coppola,
  671 F.3d 220 (2d Cir. 2012) ................................ 7

United States v. Corum,
  362 F.3d 489 (8th Cir. 2004) ............................... 4

United States v. Doss,
  630 F.3d 1181 (9th Cir. 2011) ............................. 10

United States v. Edwards,
  838 F. App'x 245 (9th Cir. 2020) .......................... 10

United States v. Evans,
  476 F.3d 1176 (11th Cir. 2007) ............................. 4

United States v. Farrell,
  877 F.2d 870 (11th Cir. 1989) .............................. 7

United States v. Guadalupe,
  402 F.3d 409 (3d Cir. 2005) ............................... 10

United States v. Lee,
  701 F. App'x 175 (3d Cir. 2017) ............................ 9

United States v. Lynch,
  437 F.3d 902 (9th Cir. 2006) ............................... 7

United States v. Mink,
  9 F.4th 590 (8th Cir. 2021) ................................ 9

United States v. Mujahid,
    799 F.3d 1228 (9th Cir. 2015) ................................. 5

United States v. Norris,
    780 F.2d 1207 (5th Cir. 1986) ................................ 21

United States v. Temkin,
    797 F.3d 682 (9th Cir. 2015) ................................. 7

United States v. Veliz,
    800 F.3d 63 (2d Cir. 2015) .................................. 11

United States v. Watson,
    852 F. App'x 164 (6th Cir. 2021) ............................. 4

United States v. Watters,
    717 F.3d 733 (9th Cir. 2013) ................................. 8

United States v. Weiss,
    630 F.3d 1263 (10th Cir. 2010) .............................. 11

**Statutes**

18 U.S.C. § 7 ................................................... 5

18 U.S.C. § 1512 ....................................... 1, 8, 9, 10

18 U.S.C. § 1951 ............................................... 1

18 U.S.C. § 3771 .............................................. 20

18 U.S.C. §§ 1201 .......................................... 1, 4

19 U.S.C. § 1951 ............................................... 6

38 U.S.C. § 8112 ............................................... 5

California Government Code § 113 ........................... 5, 6

**Other**

Fed. R. Evid. 902 ............................................. 6

**TRIAL MEMORANDUM**

**I.    STATUS OF THE CASE**

   **A.    Indictment**

   Defendant Johnny Ray Gasca ("defendant") has been charged in a second superseding indictment with kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1), (a)(2), 7(3) (Count One); interference with commerce by extortion, in violation of 18 U.S.C. § 1951(a), (Count Two); attempted obstruction of justice, in violation of 18 U.S.C. § 1512(b)(2)(B) (Counts Three and Four); and attempted witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count Five).

   **B.    Discovery**

   The government has produced hundreds pages of discovery to defense counsel, including investigation reports, arrest reports, photographs, certified court records, information regarding defendant's criminal history, victim medical records, expert reports, and financial records, as well as video and audio files.

   Defense counsel has not produced any reciprocal discovery.

   **C.    Trial**

   Trial Date:  A bench trial is currently scheduled for December 5, 2022.

   Estimated time:  The estimated time for the government's case-in-chief is three to four days.  The government anticipates calling up to nine witnesses in its case-in-chief: (1) V.A. (victim's family friend); (2) Veterans Affairs ("VA") Police Officer Brittney Miller; (3) co-defendant David Richard Tscherny; (4) FBI Special Agent Michael Fukuda; (5) K.M.; (6) FBI Special Agent Gary Wallace; (7) Chase employee Arnaz Ifopo; (8) Dr. Erik Lande; and (9) Paul R. Greenwood.

1     The defense has noted its intent to call victim E.C. and has
2 requested contact information for victim E.C.'s daughter.
3     Stipulations:  The parties do not anticipate filing any
4 stipulations.
5     Defendant:  Defendant is detained pending trial.
6     **D.   Motions in Limine**
7     The government filed a motion to admit evidence of defendant's
8 prior financial exploitation of the victim, (Dkt. 75), defendant
9 filed an opposition (Dkt. 89), and the government filed a reply
10 (Dkt. 97).
11     Defendant filed a motion to exclude the expert testimony of Paul
12 R. Greenwood, the government opposed, and defendant filed a reply.
13 (Dkt. 81, 93, and 96.)
14     Defendant also filed a motion to exclude the expert testimony of
15 Dr. Erik Lande, the government opposed, and defendant filed a reply.
16 (Dkt. 82, 92, 98.)
17     The government filed a motion to introduce evidence of
18 defendant's prior federal criminal case, defendant opposed, and the
19 government filed a reply.  (Dkt. 100, 102, 103.)
20     At the November 2, 2022 pretrial conference, the Court granted
21 the government's motion to admit evidence of prior financial
22 exploitation of the victim, denied the motion to exclude the expert
23 testimony of Paul R. Greenwood, denied the motion to exclude the
24 expert testimony of Dr. Erik Lande, and denied the motion to admit
25 evidence of defendant's prior case.  (Dkt. 109.)  The government
26 submitted a Notice of Lodging of findings with respect to the Court's
27 expert rulings.  (Dkt. 114.)
28

## II.  THE CHARGED OFFENSES

### A.  Kidnapping (Count One)

Defendant is charged with kidnapping under two federal jurisdictional theories: (i) kidnapping involving travel in interstate commerce or use of a means of facility in furtherance; and (ii) kidnapping within the special maritime and territorial jurisdiction of the United States.

#### 1.  <u>Kidnapping – Interstate Commerce</u>

The elements of kidnapping involving travel in interstate commerce or use of a facility or means of interstate commerce are as follows:

(1)  First, the defendant seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away [victim];

(2)  Second, the defendant held or detained [victim] against her will; and

(3)  Defendant traveled in interstate commerce or used any means, facility, or instrumentality of interstate commerce in committing or in furtherance of committing the offense.

Ninth Circuit Model Criminal Jury Instruction No. 17.1 [Kidnapping—Interstate Commerce] (2022 ed.)

The government expects to prove the interstate commerce requirement by showing both that (1) defendant traveled in interstate commerce (by airplane from New York to California), (2) defendant "used any means, facility or instrumentality of interstate commerce" in committing or in furtherance of the kidnapping (his cellphone); and (3) co-defendant David Tscherny traveled from Arizona to California to help defendant's kidnapping.  The use of a cellular telephone during the commission of or in furtherance of a kidnapping

qualifies as a "means, facility or instrumentality" of interstate commerce.  See United States v. Clayton, 108 F.3d 1114, 1116-17 (9th Cir. 1997) ("Telephones are instrumentalities of interstate commerce."); see also United States v. Evans, 476 F.3d 1176, 1180-81 (11th Cir. 2007) ("Telephones and cellular telephones are instrumentalities of interstate commerce.  Evans's use of these instrumentalities of interstate commerce alone, even without evidence that the calls he made were routed through an interstate system, is sufficient to satisfy [the] interstate-commerce element."); United States v. Corum, 362 F.3d 489, 493 (8th Cir. 2004) ("It is well-established that telephones, even when used intrastate, are instrumentalities of interstate commerce."); United States v. Watson, 852 F. App'x 164, 168 (6th Cir. 2021) ("Our caselaw unequivocally holds that 'cellular telephones, even in the absence of evidence that they were used to make interstate calls, [are] instrumentalities of interstate commerce.").

> 2.   Kidnapping – Special Maritime and Territorial Jurisdiction

The elements of kidnapping within the special maritime and territorial jurisdiction, in violation of 18 U.S.C. §§ 1201(a)(2), 7(3), are as follows:

(1)  First, the defendant seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away [victim] within the special maritime and territorial jurisdiction of the United States; and

(2)  Second, the defendant held or detained [victim] against her will.

1  Ninth Circuit Model Criminal Jury Instruction No. 17.2 [Kidnapping—
2  Within Special Maritime and Territorial Jurisdiction of United
3  States] (2022 ed.)

4       The government expects to prove at trial that the kidnapping
5  occurred on the grounds of the West Los Angeles Veterans
6  Administration facility within the special maritime and territorial
7  jurisdiction ("STMJ") of the United States.  The Ninth Circuit has
8  "approved of the trial court deciding the jurisdictional component of
9  a crime to the extent it presents a pure question of law with no
10 disputed questions of fact underlying it."  United States v. Mujahid,
11 799 F.3d 1228, 1237 (9th Cir. 2015).  As relevant here, the STMJ
12 includes "[a]ny lands reserved or acquired for the use of the United
13 States, and under the exclusive or concurrent jurisdiction thereof."
14 18 U.S.C. § 7(3).  Federal law further provides that the Secretary
15 for Veterans Affairs, "on behalf of the United States, may relinquish
16 to the State in which any lands or interests therein under the
17 supervision or control of the Secretary are situated, such measure of
18 legislative jurisdiction over such lands or interests as is necessary
19 to establish concurrent jurisdiction between the Federal Government
20 and the State concerned.  Such partial relinquishment of legislative
21 jurisdiction shall be initiated by . . . in such other manner as may
22 be prescribed by the laws of such State, and shall take effect upon
23 acceptance by such state."  38 U.S.C. § 8112.

24      California Government Code § 113 provides the process through
25 which California can accept retrocession of concurrent jurisdiction
26 from the United States, including an acceptance of the retrocession
27 of jurisdiction at a public meeting of the California State Lands
28 Commission.

1    Here, there is no dispute that the kidnapping occurred on land
2  over which federal government exercises concurrent jurisdiction (and
3  therefore within the STMJ of the United States).  The government will
4  introduce certified and executed documents from the California State
5  Lands Commission establishing the retrocession of concurrent
6  jurisdiction by the Veterans Administration over the location of the
7  kidnapping, the West Los Angeles Veterans Administration Hospital.
8  See generally Fed. R. Evid. 902(1) (providing that documents bearing
9  a seal of a department of a state and a signature purporting to be an
10  execution is self-authenticating).  In the document, the State Lands
11  Commission recognized that "[a]ll requirements of Section 113 of the
12  California Government Code have been met" and accepted retrocession
13  from the VA Secretary over a number of locations, including "Veterans
14  Administration Hospital, Los Angeles (Brentwood); [and] Veterans
15  Administration Hospital, Los Angeles (Wadsworth)."  An exhibit to the
16  Resolution included a map of these two properties over which
17  concurrent jurisdiction exists which includes the grounds of the West
18  LA VA where defendant abducted E.C.  A VA Police Officer witness will
19  identify the location of the kidnapping as within the bounds of the
20  area over which concurrent jurisdiction exists.

21    **B.   Interference with Commerce by Extortion (Count Two)**

22    The elements of Interference with Commerce by Extortion, in
23  violation of 19 U.S.C. § 1951(a), are as follows:

24    (1) Defendant induced or intended to induce the victim to part
25  with property by the wrongful use of actual or threatened force,
26  violence, or fear;

27    (2) Defendant obtained the property with the victim's consent;

28

6

(3) Defendant acted with the intent to obtain the property; and

(4) Commerce from one state to another was affected in some way. Ninth Circuit Model Criminal Jury Instruction No. 9.5 [Extortion or Attempted Extortion by Force] (2022 ed.).

Here, defendant used force to abduct E.C., and the implicit threat of additional violence against her, in order to induce her to consent to empty her account at Chase Bank and hand the money over to defendant. See generally United States v. Farrell, 877 F.2d 870, 876 (11th Cir. 1989) (affirming sufficiency of the evidence for Hobbs Act extortion conviction where defendants abducted bank manager's daughter and obtained money from bank manager with his consent). The fact that E.C. acted cordially toward the defendant at times before and after the extortion does not preclude the possibility that her withdrawal of money from her account was induced by fear. United States v. Coppola, 671 F.3d 220, 241-42 (2d Cir. 2012) (rejecting argument that "cordiality" between extortion defendant and victim "precluded a finding of underlying fear").

As to the interstate commerce element, defendant's travel from New York to California to commit the extortion and his use of a cell phone to make interstate calls before, during, and after the crime are sufficient to establish an affect in interstate commerce. See United States v. Temkin, 797 F.3d 682, 690 (9th Cir. 2015) (affirming evidence of effect on interstate commerce for Hobbs Act extortion charge where "extortion plan would have involved international travel"); United States v. Lynch, 437 F.3d 902, 911 (9th Cir. 2006) (interstate travel and "interstate telephone calls" during and after robbery established a "direct effect on interstate commerce" for Hobbs Act purposes); United States v. Atcheson, 94 F.3d 1237, 1243

1  (9th Cir. 1996) ("[P]lacement of out-of-state phone calls . . .

2  created a further connection with interstate commerce").  Defendant's

3  extortion of funds from a bank headquartered in Ohio further

4  establishes an effect on interstate commerce.  Atcheson, 94 F.3d at

5  1243 (extortion of bank account information for bank "headquartered

6  in another state" sufficient to establish extortion "directly

7  affected interstate commerce").

8     **C.   Attempted Obstruction of Justice (Counts Three and Four)**

9      The elements of a violation of 18 U.S.C. § 1512(b)(2)(B) are as

10  follows:

11     (1)  The defendant attempted to corruptly persuade another

12  person;

13     (2)  The defendant acted knowingly; and

14     (3)  The defendant acted with the intent to cause or induce any

15  person to alter, destroy, mutilate, or conceal an object with the

16  intent to impair the object's integrity or availability for use in an

17  official proceeding.

18  Seventh Circuit Criminal Pattern Jury Instructions [18 U.S.C.

19  § 1512(b)(2)(B) Witness Tampering—Altering or Destroying Evidence--

20  Elements] (2022 ed.).

21      "In a prosecution under 18 U.S.C. § 1512(b)(2)(A) or (B) . . .

22  the term 'corruptly' must reflect some consciousness of wrongdoing."

23  Ninth Circuit Model Criminal Jury Instruction No. 4.12 [Corruptly]

24  (2022 ed.).  The government need not prove that defendant acted with

25  "evil" or "wicked" intent.  United States v. Watters, 717 F.3d 733,

26  735 (9th Cir. 2013).

27      To prevail on these counts, the government is not required to

28  prove that defendant was actually successful in his efforts to

1  obstruct--a defendant's telephonic request to hide or destroy

2  evidence is sufficient.  United States v. Mink, 9 F.4th 590, 610 (8th

3  Cir. 2021) (sufficient evidence for attempted obstruction based on

4  "instructing [father-in-law] on the phone to destroy" evidence while

5  "expressly acknowledg[ing] that the government was building a case

6  against him"); United States v. Bernhardt, 903 F.3d 818, 827 (8th

7  Cir. 2018) (affirming conviction for attempted obstruction of justice

8  where evidence showed that "after Bernhardt was charged with

9  exploitation, and thus had knowledge of an official proceeding, he

10 asked [the victim] to delete any nude images of herself"); United

11 States v. Akiti, 701 F.3d 883, 887-88 (8th Cir. 2012) (sufficient

12 evidence of obstruction of justice based on jail call recordings in

13 which "Akiti was directing his wife to destroy currency from the

14 robbery in order to prevent the government from using the currency as

15 evidence against him in the robbery prosecution"); United States v.

16 Lee, 701 F. App'x 175, 184 (3d Cir. 2017) ("The record shows that Lee

17 took several substantial steps directed at obstructing justice. In

18 particular, he told his cousin to retrieve his phone from the FBI and

19 have someone wipe the data from it.  When that did not happen, he

20 then told his cousin to have the phone wiped remotely.  He continued

21 to ask his cousin if he had successfully had the phone wiped.  And

22 when his cousin refused to destroy the evidence as Lee demanded, Lee

23 asked for the contact information for someone who could wipe the

24 phone so that Lee himself could make the arrangements.").

25      D.   **Attempted Witness Tampering (Count Five)**

26      The elements of attempted witness tampering in violation of 18

27 U.S.C. § 1512(b)(3) are as follows:

28

9

(1)   The defendant attempted to corruptly persuade another person;

(2)   The defendant acted knowingly; and

(3)   The defendant acted with the intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense.

Seventh Circuit Criminal Pattern Jury Instructions [18 U.S.C. § 1512(b)(3) Witness Tampering—Hinder, Delay or Prevent Communication Relating to Commission of Offense—Elements] (2022 ed.).

"Attempts to persuade a witness to lie are clearly covered by 1512(b)." United States v. Doss, 630 F.3d 1181, 1190 (9th Cir. 2011).  Asking your accomplice to lie to law enforcement is enough to establish attempted witness tampering beyond a reasonable doubt.  See United States v. Edwards, 838 F. App'x 245, 247-48 (9th Cir. 2020) (finding no plain error on witness tampering jury instructions based on overwhelming evidence of guilt where "Edwards contacted multiple victims by phone and Facebook to try to stop them from cooperating with law enforcement"); Bernhardt, 903 F.3d at 827 (affirming conviction under 1512(b)(3) where defendant asked victim to tell authorities "'You don't know me'") see also United States v. Guadalupe, 402 F.3d 409, 414 (3d Cir. 2005) (affirming attempted witness tampering conviction based on prison administrator's asking subordinate not to report beating of prisoner).

The fact that the defendant did not speak directly to the witness does not matter; "an attempt to persuade one person . . . to prevent another person . . . from communicating information about a crime to a law enforcement officer . . . violates the statute."

10

United States v. Veliz, 800 F.3d 63, 70 (2d Cir. 2015); United States v. Weiss, 630 F.3d 1263, 1274 (10th Cir. 2010) (affirming attempted witness tampering conviction where evidence "showed that Weiss, through his codefendant . . . asked three witnesses to lie to investigators"); United States v. Byrne, 435 F.3d 16, 26 (1st Cir. 2006) (affirming conviction for attempted witness tampering based on defendant's telling one witness to tell another witness to tell investigators they knew nothing about assault).

**III. STATEMENT OF FACTS**

The evidence at trial will show, beyond a reasonable doubt, that defendant kidnapped E.C. for her money, drained her bank accounts, and then attempted to obstruct justice and commit witness tampering while in pre-trial custody.

**A.   Defendant Begins Fraudulent Relationship with Victim E.C. to Get Her Money**

In defendant's post-arrest Mirandized interview, he told FBI agents that he met E.C. while she was cleaning the bathroom at his apartment building in Bronx, New York, and the two moved in together. Defendant said that E.C. was "a little off" and did not even know her own Social Security Number.  Defendant, however, had E.C.'s social security number and "all her information written down," had access to her finances, and handled all of her financial transactions. According to defendant, E.C. did "not care about money" and she gave defendant money "plenty of times."  Defendant estimated that E.C. gave him a total of $50,000 over the course of their fake relationship.  On one occasion, defendant said that he spoke to E.C.'s retirement fund manager, learned that E.C. had $35,000 in her retirement account, and defendant took all the money in her account.

Certified business records from E.C.'s retirement fund manager confirm the withdrawal.  Defendant also told agents that he transferred E.C.'s money to himself without asking her.

Defendant's friend, K.M., was able to discover the true nature of defendant's "relationship" with E.C.  Defendant told K.M. that he used E.C. for her money.  On one occasion, K.M. was present in the room when defendant hit E.C. in the face during an argument.

**B.   May 2021 - E.C. Escapes from Defendant's Grasp**

In May 2021, defendant and E.C. traveled from New York to Los Angeles to attend a wedding.  While visiting Los Angeles, E.C. met up with a family friend, V.A., who lived in the area.  V.A. became concerned about E.C.'s mental condition and the level of care she received in New York.  V.A. and E.C. decided that E.C. should remain in the Los Angeles area so that E.C. could be medically evaluated.

In text messages to V.A. following this encounter, defendant acknowledged E.C.'s mental condition but tried to minimize it, telling V.A. that it's just "a 3 to 5 percent thing" and that E.C. just "[n]eeds a little help. Not a lot."  Eventually, however, defendant's tone shifted and he began sending threatening messages to V.A.  In one message, defendant told V.A., "I will go to your job and inform the supervisors what's going on and call the police from there."  Defendant eventually returned to New York without E.C.

**C.   Defendant Tells His Friend That He Needs E.C's Money**

After returning to New York, defendant began planning to abduct E.C. in Los Angeles.  Facebook Messenger messages from defendant's phone evidence his intent in abducting E.C. – to get her money.  On July 11, 2021, eight days before the kidnapping, defendant messaged his friend, Edward Santiago, "If I get [E.C.] back all will be great

12

again as far as money."  A week before the kidnapping, on July 12,

2021, defendant messaged that he needed to "just get [E.C.] the fuck

away from that lady.  I want to hurt that lady so badly.  But I will

keep my cool that day and stick to the mission – to retrieve [E.C.]."

In even more explicit terms (and dispelling any notion that

defendant was in a loving, committed relationship with E.C.), on July

15, 2021, defendant wrote, "Have to rescue the Golden Goose.  If I

get my UBI[1] [E.C.] back she has 16 grand returned to her from her

bank pl[u]s a few grand."  Santiago then responded, "Wow like 20 gs."

Defendant reaffirmed, "Get [E.C.] back and it's a wrap."

In his post-arrest statement, defendant told FBI agents that he

suspected that E.C. would go to a Veterans Administration hospital in

Los Angeles to try to receive care.  Based on that suspicion,

defendant repeatedly called the West LA VA and, posing as E.C.'s

"home caretaker," asked West LA VA staff if they had any appointments

scheduled for E.C.  During one such phone call, a week before the

kidnapping, West LA VA staff told defendant that E.C. had an

appointment on July 19, 2021.  On July 10, 2021, defendant texted a

friend, K.M., about his plans to grab E.C. from the West LA VA:

> I'm going to LA next week.  I need your help to get [E.C.].
> I know where she will be at one morning, for an
> appointment.  I need you to drive me.  There is a parking
> lot and if I am walking around I might be spotted and the
> bitch taking her will pull off.  It's in LA, Wilshire Blvd.
> They have no idea I know, so it will be a complete
> surprise.

---

[1]  "UBI" may refer to universal basic income, a policy proposal
in which people receive a set amount of money from the government
every month. "Universal basic income," Wikipedia, available at:
https://en.wikipedia.org/wiki/Universal_basic_income (last visited
Nov. 21, 2022).

1  When that friend was unable to help, defendant turned to his co-
2  defendant, David Tscherny.  The night before the kidnapping,
3  defendant texted Tscherny the itinerary for his flight from New York
4  to Los Angeles and asked Tscherny to pick him up at LAX.

5      On his way to LA, defendant sent an audio message to his
6  associate in New York and outlined his plan to forcibly abduct her:
7  "Hopin' it'll just be easier than I thought.  She just come up . . .
8  I'm not gonna do much of anything.  'Hey, what's up baby?  It's your
9  handsome Johnny Ray.  What's up, hon?'  Give her a kiss, give her a
10  hug, and just--start guiding her right away, 'Come on, come on, come
11  on' . . . just shuffle her off."

12      After Tscherny picked up defendant at the airport, the two
13  eventually made their way to the West LA VA where they laid in wait
14  for E.C.  While he waited for his victim, defendant messaged Santiago
15  that he planned to use violence against V.A. or her husband if they
16  stood in his way: "They will be shocked and scared when they see me.
17  . . . So worst happens.  Hu[s]band gets knocked out or his wife gets
18  slapped.  But that will only happen they go there."

19      Defendant also messaged that he planned to take E.C. against her
20  will.  "Even she says she wants to stay, I'll tell her that you and
21  my mom and Roxanne are waiting for her back at the hotel.  'Just let
22  them know youre okay and you can come back.'  I'm just going to usher
23  her out of there, not start a conversation."  Defendant's plan was
24  always to get E.C.'s money: "[I]f I get her I[']ll go straight to the
25  bank then airport."

26      Unaware that defendant was waiting to ambush them, V.A. had
27  taken E.C. to the West LA VA to inquire about medical care.  When
28  E.C. and V.A. walked out of the hospital toward their car, West LA VA

surveillance video, from a distance, shows that defendant approached E.C., put his arm around her, and pushed her to another part of the parking lot where Tscherny and his truck were waiting.  Defendant then picked E.C. up, threw her in the back seat of Tscherny's truck, got himself into the front passenger seat, and drove off.  The parking lot where E.C. was kidnapped was located within the STMJ of the United States.

Almost immediately after the abduction, Tscherny began surreptitiously recording a video of defendant and E.C. using his cell phone that was propped up on the dashboard of his truck.  In the video, defendant admitted his kidnapping of E.C. and chided her, "You almost didn't want to get in the car. I had to push you into the car!"  Defendant also admonished E.C., "I'm upset that you didn't wanna get in the car.  You didn't want to get in the car, honey . . . You said, 'I'm sick, I'm sick, I wanna stay.'"  Defendant then rebuked Tscherny for failing to drive over earlier, saying "[s]ee all the pushing I had to do to get her in the car?  . . . I had to walk all the way over and push her in the car."

After defendant had berated E.C. for fifteen minutes about how her unwillingness to go with him at the West LA VA, E.C. implored defendant, "don't punch me."

Later, defendant sent an audio message to his friend in New York detailing the kidnapping and how it was committed against E.C.'s will.  "As anticipated, she was a little hesitant to get--to get in the truck with me.  She was like, 'I'm sick,' and she looked a little scared, and she definitely--would not have gone with the police officers, 'Do you wanna go with him?'  That type of way, like.  I had to basically force her in the truck."

### D.   After Kidnapping E.C., Defendant Takes Her to the Bank and Drains Her Account

In one of the surreptitious videos taken after the kidnapping, Tscherny asked defendant if he wanted to go to the airport and defendant replied, "I gotta get money first."  Defendant then told Tscherny to drive to a Chase Bank branch.  E.C. – demonstrating her confusion and lack of awareness of her own financial affairs – overheard this conversation and said, "I don't have money anywhere." In response, defendant told E.C. that she did have money and that he knew about her money because he "ha[d] all the paperwork."  Defendant then repeatedly instructed E.C. on what to say when they got to bank ("you have to go to Chase and tell them that you have to take out some money and you want to change your pin and your numbers"). Defendant, Tscherny, and E.C. eventually traveled to the Chase Bank branch in Los Alamitos, California, and caused E.C. to close her account and withdraw all $17,504.80 from it.

After kidnapping E.C., defendant sent audio messages to his friend in New York which made clear that his abduction of E.C. was entirely about regaining her money – not about rescuing E.C. from her allegedly controlling family.  In one message, defendant said, "We're not outta the woods yet.  So, uh, they're calling the popo, the popo's callin' me, no problem.[2]  Let them be busy with that so they're not get to the money part yet.  So once I get the money I'll break out with her."  In another message, defendant explained that he was at a Social Security office to get additional identification for

---

[2] When discussing nefarious matters, defendant employed a primitive code in which he added an extra syllable to words in order to disguise what he was saying.  The quotations in this factual recitation omit the extra syllables.

E.C. before returning to Chase to get E.C.'s money out of her account.  "We'll go back to the bank and, hopefully, be able to pull, like, all out.  She got, like 20 g's so. . . pull it out, I'll be out."  In another message, defendant told his friend, "I got 17 grand, we're heading to an airport.  Hopefully we make it out with no problem."

Government expert Mr. Greenwood will testify about the hallmarks of romance scams and elder abuse, and how they may at times mimic real relationships.

**E.   Defendant Tries to Cover Up His Scam**

After his arrest and while in pre-trial custody, defendant made several jail calls to Santiago in New York imploring him to destroy evidence of his wrongdoing with E.C.  On July 27, 2021, defendant told his friend, "I want you to go into the, uh, uh, where we have a lotta videos and photos that we've shared as Facebook Messenger . . . And then immediately erase all our messages.  Because we have all the conversations of me saying things like 'Golden goose,' and things like that and they'll try to take any little thing they can.  So erase all my messages."

That afternoon, defendant again told his friend to delete their messages because it detailed his plan to scam E.C. out of her retirement money.  "Cause we have the whole issue of me saying every step, you know everything. . . Go way back, like go--'she might have the 35,000' we have all of that on our history."  That evening, defendant called his friend yet again and told him to delete all of his social media messages with his other romantic partners in order to maintain the illusion of his "relationship" with E.C. Specifically, defendant said, "delete all of the sex pictures of

Leoscel and Genesis and all of that stuff . . . cause what happens is, they'll try to play off her and be like, 'Oh so you in love with her?  But you were messaging these other girls.'"

That same day, July 27, 2021, defendant told Santiago that the FBI was looking for his accomplice, co-defendant Tscherny, and asked Santiago to delete messages between the co-defendants.  "Log into my Facebook, you erase all my messages . . . anything you see with homeboy. . . Cause remember homeboy . . . who came and drove me? They're looking for that n---- to try and arrest that motherfucker. Ya heard?  So go in there and erase all his messages . . . his name was David."

Later that day, defendant instructed Santiago to call Tscherny and tell him not to tell law enforcement that defendant had paid Tscherny $1,000 for his help in kidnapping E.C.  "Get homeboy's name, David such-and-such, you'll see it on my Facebook. . . You message him yourself, say, 'Yo, what's up, give me a ring.' . . . You talk to him on the dl you say, listen . . . they are looking for his so-called accomplice. . . If they ever do catch up to you . . . When I gave him that gee, right?  When we got the cash, cause just tell him [E.C.]'s not gonna remember that detail don't even mention that, if they happen to catch up to you."

On August 3, 2021, defendant called his friend and told him to collect his hard drives from his apartment before the FBI could seize them and learn of his financial exploitation of E.C.  "I'm certain they're gonna try to make some type of financial case because they were asking me all type of financial questions . . . [T]hey're gonna try to make the case they can make especially connecting with [E.C]. . . . . So you're gonna collect all the hard drives from my room . . .

1    try to do it as soon as possible cause they can get a search warr-- .
2    . . . any day they are gonna go there and they may secure the place and
3    take whatever."

4         **F.  Defendant Knew E.C.'s Mental Condition Was Deteriorating**

5         During a jail call on August 2, 2021, defendant's mother
6    expressed her concern about defendant's treatment of E.C.  She said,
7    "I'm worried about you because I didn't want you to go get her cause
8    you don't know, especially if you say her mind is like, little --
9    she's not all there."  Defendant cut his mother off and reminded her,
10    "these conversations are recorded, ok?  Ok, so don't say anything."
11    That same day, defendant called his friend to complain about his
12    mother's discussion of E.C.'s mental condition.  "[S]he's terrible,
13    man.  I told her the call is being recorded but before she says, 'I
14    told you not to go there because you know her mental state,' and I
15    was like, 'Shut the fuck up!'  Na mean?"  Defendant continued, "This
16    lady's terrible man.  She's like something else, man.  I'm like,
17    'what the fuck did I just tell you man, shut the fuck up' . . . Tell
18    you, I wanna choke her, man."

19         Government expert Dr. Erik Lande will confirm that E.C. suffered
20    from moderately severe dementia before, during, and after the
21    kidnapping.

22 **IV.  Crime Victims' Rights Act**

23         Given that the government intends to call V.A. and defendant has
24    subpoenaed E.C., and his mistreatment of these victims thusfar, the
25    government sets forth the following regarding the Crime Victims'
26    Rights Act ("CVRA").

27         The CVRA defines a "crime victim" as a "person directly and
28    proximately harmed as a result of the commission of a Federal

offense."  18 U.S.C. § 3771(e)(2)(A).  The CVRA mandates that victims
– like V.A. and E.C. – have, among other things, the "right to be
reasonably protected from the accused" and the "right to be treated
fairly and with respect for [their] dignity and privacy."  18 U.S.C.
§ 3771(a)(1), (8).  To give these rights teeth, the CVRA allows the
government, the victim, and/or the victim's lawful representative to
assert such rights in the district court in which the defendant is
being prosecuted.  18 U.S.C. § 3771(d)(1), (3).  The district court
must decide a motion asserting a victim's rights "forthwith."  18
U.S.C. § 3771(d)(3).

As Congress stated:

> The broad rights articulated in this section are meant to be
> rights themselves and are not intended to just be
> aspirational.  One of these rights is the right to be treated
> with fairness. . . . This provision is intended to direct
> government agencies and employees, whether they are in
> executive or judicia[l] branches, to treat victims of crime
> with the respect they deserve.

150 Cong. Rec. S4269 (Apr. 22, 2004) (statement of Sen. Kyl).

Accordingly, the CVRA affords victims the right to seek mandamus
relief where a court denies a victim the relief sought.  See 18
U.S.C. § 3771(d)(3) ("The court of appeals shall take up and decide
such application forthwith within 72 hours after the petition has
been filed."); see Kenna v. U.S. Dist. Ct. for C.D. Cal., 435 F.3d
1011, 1013 (9th Cir. 2006) (granting a writ of mandamus and finding
that the district court had erred in not allowing a victim to speak
at sentencing, implicating the victim's right to be "reasonably
heard" under the CVRA).

While defendant has constitutional rights to self-
representation, examination, and cross-examination, they are not

1   unlimited.  "The right of self-representation is not a license to
2   abuse the dignity of the courtroom.  Neither is it a license not to
3   comply with relevant rules of procedural and substantive law."
4   Faretta v. California, 422 U.S. 806, 834, n.46 (1975).  A trial judge
5   maintains broad discretion regarding the management of the manner in
6   which the trial will be conducted even with a defendant representing
7   himself.  See United States v. Norris, 780 F.2d 1207, 1211 (5th Cir.
8   1986) ("Whether an accused in a particular case should be permitted
9   to examine some but not all the witnesses must be left to the sound
10  discretion of the district court."); Martinez v. Court of Appeal of
11  California, Fourth Appellate Dist., 528 U.S. 152, 162 (2000)
12  (government's interest in ensuring integrity of trial at times
13  outweighs defendant's interest in acting as his own lawyer).

14      Based on the record before the Court – including defendant's
15  exploitation of E.C., his repeated harassment of victim V.A. at her
16  place of work, and threats to physically harm V.A. and her husband –
17  the government reserves its right to seek narrowly-tailored
18  safeguards during defendant's questioning of these victims, if
19  needed.

20  **V.    CONCLUSION**

21      The government respectfully requests permission to file
22  additional trial memoranda if necessary.